Do you have $20? MonkeyMedia v. Apple et al. 2016-15-58 May it please the court. MonkeyMedia appeals the board's decision on three issues. The first issue I want to address is the priority of the Sposato reference, and specifically the board's finding that MonkeyMedia did not exercise reasonable diligence in reducing its invention to practice, such that it could not swear behind the Sposato reference. The supplemental citation of authority that I filed recently with this court calls the court's attention to the perfect surgical technologies decision that this court issued last November, and I think that decision clearly sets the standard that the board should have applied in this case and did not. The court in perfect surgical technologies criticized the board in that case for applying an overly strict legal standard. Mr. Baird asserts that an unspecified number of people who aren't named worked, quote, steadily, consistently, or continuously on various projects that purportedly led to the reduction to practice of 143. But he only identifies four dates within the critical period. He doesn't explain when the work was done or what work was done with any specificity. How do you get by that? Well, I disagree that he identifies just the four dates. He identifies the four stages that the prototype had to go through to completion. He identifies the date that the reduction to practice began, which was September 1st of 1995, when they signed the contract setting out the work schedule that defined the four stages of what had to be done with each. And yes, the invoices for each of those four stages were certain dates. Several of those documents relate to work outside the critical dates, don't they? Some of the work relates—the four stages that I'm talking about all relate to the critical period, Your Honor. They begin in September 1995, right when the critical period begins. There was other work done outside the critical period leading up to this agreement to reduce the prototype. Yeah, the four stages are things like rough electronic assembly of the storyboard, but it doesn't tell us what that means. It doesn't tell us what constitutes rough electronic assembly or how it relates to 143. Invoices identify dates on which flat fee work was built with four stages, but they don't add any detail about what activity was involved in completing each stage. And Mr. Baer acknowledged at JA-968 that the invoices aren't a measure—a reliable measure of the work performed because they were issued before the work was completed. Let me address several of those points, Your Honor. The first one, the first stage completion, is attached to Mr. Baer's affidavit. That's the program specification. That's the 20-page outline that describes exactly what the prototype is going to look at and sets the framework that they were going to build on. Mr. Baer testified that using that specification, Monkey Media began creating the functioning baguette prototype. He attached the end source code, which is 50-plus pages long, and describes the process of assembling the video and the other images and programming the— But none of this is correlated with claim limitations. Your Honor, I— That's what diligence requires, showing an activity on specific dates in relation to claim limitations. He attached a walkthrough, video walkthrough of the prototype and explained both on the conception side and on the reduction to practice side how the claims were found in those two signposts. And between them, he testified that over those four months, he and his team at Monkey Media worked steadily and continuously to produce the prototype. $100,000, four stages, 20— And invoices showing that the work was invoiced throughout that critical period and that further work was done to debug the prototype and get it ready for final presentation. Well, it's work toward a reduction to practice, not billing that comes. Conceded, yes, but the billing shows that the work was done over that period. In other words, when a stage was completed, it was invoiced. And that was what—the work was ongoing as he proceeded to the reduction to practice, to the production of the prototype. And the fact that the prototype contained—reduced the invention to practice with all the claim limitations and the conception at the beginning that he showed with his other storyboards also did the same, shows that in the interim, as he testified to in his affidavit,  The board's erroneous legal standard led it to identify certain gaps and focus on those gaps of inactivity. The first gap in particular was erroneous because the program specification itself, the document that was attached, contained several dates in October showing that it was revised and produced during that alleged gap. And so we believe that the board's erroneous and overly strict legal standard led it to make unsubstantiated fact findings regarding the diligence that Mucky Media showed during that critical period, and that this court should reverse and remand so that the board can consider the entire evidence under the proper standard. Now, the second issue that we have is whether the invention is obvious in light of Davenport, and particularly whether the transition claim limitations— You concede at some point in Pellin's brief 28 that Davenport's checkerboard effect blends content from two sources, thus teaching the transition— We don't concede that, Your Honor. We concede that a checkerboard transition can involve two different images. Well, you say it may well have been proper for the PTAB to find that the checkerboard effect blends content from two different sources. Okay, two different images is what we were talking about there. But what the Davenport or the checkerboard transition, as taught in Davenport, doesn't do is involve the playing of two streams of content—segments of content at the same time. That is what the inventive aspect of the 143 patent is that is not present in Davenport. And that is found in her specification, where she consistently talks about how the transition effect has to be applied at the end of one segment or the beginning of another segment, and that her invention itself always involves one segment at a time playing, and that when a user elects a— Where did the relevant claims of the 143 patent require the simultaneous playing of video segments? It's Claim 9, I believe, Your Honor. It's Claim 9 recites— The transition comprises playing a portion of the main content simultaneously with playing a portion of the expansion content. Right. And so that is what Davenport doesn't do. Davenport requires that the main content stop before the expansion content begins. Figure 4A in the specification of the 143 illustrates the concept that is at issue here. It shows a thought bubble, which is the cue that is selected, and then as a transition, as it expands bigger to take up the whole screen, the expansion content starts to play while the main content is still playing behind it. I don't understand, though. Where in that language does it require the playing of video content? Well, I guess the content can be—it's an audiovisual content. And in any case, Davenport discloses the use of transitioning effects in videos, and that's Column 6, Lines 26 to 32, discussing the creation of video segments, and Column 9, Lines 37 to 67, discussing the use of transition effects in segments. So? So, but she doesn't discuss the two segments playing at the same time, and that is what Mr. Baer's invention involved, simultaneous playing of the main content and the expansion content. Davenport testified in her specification supports that that is something that she couldn't do back in 92 when she was inventing her invention. And her testimony as well that the board did not consider was that she actually viewed the prototype at the time that Mr. Baer introduced it to practice, and specifically recalled praising the type of transitions that they were able to achieve. Yeah, Davenport's an interesting witness, all right. So those are the kind of things that show that the transitions that Monkey Mania was able to achieve in the 1-4-3 are not obvious in the life of Davenport, and the board erred in both the way it interpreted her specification and what she was claiming, and in her testimony about what she witnessed contemporaneously at the time of the baguette prototype. And again, the meetings with her are documented in those invoices that we talked about earlier in the reduction of practice. They happened back there in 1996. She actually witnessed the prototype and saw what Mr. Baer and his other inventor were able to achieve at that time. The last issue is the cube container and the board's claim construction of that term. We contend that the construction of the term is not consistent with the 1-4-3 specification, that it was too broad because it encompasses a cube container that could be the entire screen that the viewer sees. And we contend that that's too broad because the cube container has to be a defined shape within the screen that contains the cubes. Again, the specificity... But the board didn't affirm the examiner's obviousness findings on the basis of DVD demystified. It affirmed based on Sposato and Davenport alone. So the statement is true. Your Honor, that's right, and we say Sposato is not prior art to begin with, but the reference that we believe really implicates the cube container is the DVD demystified. But regardless, the construction that the board reached was too broad. The figures in the specification describing the cube container all show it as a cup or an image within the screen. Nothing supports a construction that would support it as broad as the entire screen. I'm entirely out of time, so I'd like to save some time. Mr. Matsui? Thank you, Your Honor. May it please the Court. The board's decision should be affirmed in its entirety. Now, I'd like to first start with diligence. The board correctly found that Monkey Media's evidence was tantamount to a mere assertion of diligence. And what Monkey Media effectively asks here is for this court to reweigh the evidence. But not only is that improper under the substantial evidence standard of review, there's effectively no evidence for this court to reweigh. If we look at the evidence as a whole, they have nothing more than a few conclusory assertions of working steadily or working continuously in their inventor declaration. And then they have some vague documentation to which they don't explain what activities were occurring, when those activities, for the most part, were occurring, and how at all they related to the alleged reduction to practice of the claimed invention, which here is directed to the transmission of interactive content to a player. All their evidence really shows, at most, is that they were working on a prototype for some sort of optical disc to be read by a player. And there's no evidence at all here that they were actually working to the reduction to practice of a transmission system of content that's going to be played on a player. I'd like to address Perfect Surgical because there was that Rule 28 J letter that was filed on Friday. And this case is nothing like Perfect Surgical. There was not a legal error in this case like there was in Perfect Surgical, where the board appeared to apply a stringent standard where it required the inventor to account for all the periods during the critical period with actual inventive activity. In other words, it did not allow there to be periods of inactivity that could have been excused, such as in Perfect Surgical, the inventor's 80-hour work week with respect to surgeries, four to six surgeries a week. And it also did not allow the inventor to count the period of time in which the attorney, the patent attorney, was actually working on the application to reduce it to practice. And so you had a fundamental legal error in that case. There's no such error in this case. The board was very clear that it recognized that periods of inactivity could be consistent with the diligence standard so long as they were explained. But what Perfect Surgical does not say, it does not allow an inventor to simply say that they were working steadily, that they were working consistently, and then have that be enough by simply then submitting some vague documentation to sort of show that there might have been some activity that was going on during the critical period. The second point is that Perfect Surgical really was a rule of reason case. There was very rich inventor testimony in that case. It was an IPR. And so what you had in that case was an inventor declaration that was more specific as to specific activities that were occurring as to specific dates. There was the attorney declaration that was submitted. There was deposition testimony from the inventor as well. And so it was a fundamentally different case where you had all this evidence from the inventor himself that needed to be corroborated. And in that situation, this court held that you cannot nitpick the evidence when you're doing the corroboration. You apply a rule of reason test to see whether or not these specific facts that are alleged by the inventor are corroborated. That's not what happened here. There's really nothing that can be corroborated when you look at Bayer's declaration because it is so nonspecific as to the activities that were occurring during the critical period. And I'd just like to touch upon the fixed fee contract itself. Yes, there was a fixed fee contract which had vague language to design, to develop, to create this prototype, and it had four stages. But there's no indication as to how much time each of these stages took, what activities were undertaken to create all these activities. And so we don't know if this was something – these are four stages that could have taken everybody else in the whole world one month to do or if it was something that should take four months to do. There's no evidence in which a fact finder can make that determination. And when we're operating under the substantial evidence standard review here, the issue isn't whether or not there is some evidence in which the board could conclude that there's diligence. It has to be that it would be unreasonable for the board on this meager record to conclude that there was no diligence. Now, I know that my friend mentioned that there was a gap period that the board mentioned in which there might have been activity that actually occurred. I think it's important to actually look at what the board said about that gap period because I think that's very important. And that's at Appendix 9 of the board's decision. It says it discusses a gap period of September 30th to October 23rd. But what it's looking at there is the hourly work, and it's saying there was no hourly work even built in that period. And then it went on to say that we're going to look at the contractor agreement, which has those four stages, and there's nothing that's specific. The contractor agreement does not specify any specific dates that any activity was actually performed and what any alleged activity might have been. And so when it's addressing that gap period, it's saying there was no hours built, and we can't tell from the contractor agreement what was going on during that period of time. We don't know when that program documentation was created. We don't know how long it took. We don't know all the activities that might have been required to create it. So there's simply nothing that a fact finder could latch on there to find reasonable diligence in this case. And I think that that's particularly true when you look at the fact that you need to have the diligence activity directly related to the reduction to practice of the claimed invention, which here are transmission claims. We know from Baer's declaration at A1784 that they really didn't even have any transmission system in mind because in his declaration he just said that they had a long-term goal of transmission. And there's no evidence here in any of this diligence evidence that they were directing this towards a transmission system. Now I'd like to just briefly turn to Davenport and then the Q container. I think it's absolutely correct that the claim language in Claim 9 just says playing a portion of the main content simultaneously with playing a portion of the expansion content. And that's what Davenport discloses because it talks about visual transitions, visual progressions, and it talks about checkerboard and Venetian blinds in which one image and another image are going to be playing at the same time. But more importantly, we had an expert that testified, and that's at A1432-33, in which he said that a person of ordinary skill in the art reading this prior art would understand it to disclose these types of progressions. And so when we have Davenport's testimony on the other side, this is simply just a battle of the experts as to what the prior art discloses. Under the substantial evidence standard review, the board's decision is well supported by the evidence here. And then lastly, I'd like to turn to the Q container issue. Again, I don't believe the court needs to reach this issue. The rejection was based upon Sposado and Davenport. They've waived any argument with respect to Q container in Sposado since they didn't raise it in their opening brief. So there's nothing really to address here at all on that claim construction issue. If the court wanted to address it under BRI, the construction is entirely reasonable. You're talking about a classic case of a patent owner that's trying to narrow its claim down to a small set of examples, specifically a figure in the specification, like this cup, for example, that contains different Qs. The board's construction here was entirely reasonable, any bounded area, any component that contains Qs, and that's entirely consistent. But they didn't construe it in light of DBD demystified. You're right. Yes, Your Honor. I mean, so I think the issue, the court should not even address this issue. If there are no further questions, then we would ask the court to affirm. Thank you. Mr. Matsui, Mr. Christian has a few minutes of rebuttal time. Your Honor, in perfect surgical, the court held that the purpose of the diligence analysis is to make sure that the invention was not abandoned or unreasonably delayed. And the evidence here shows that Mr. Baer met that standard. There was a contract which set out a specific schedule, begin September 1, end by the end of the year, and he explained how his company met that schedule by producing the prototype. There's no evidence or suggestion that he ever unreasonably delayed or picked up some other project or abandoned this project. He followed it through to completion to produce the prototype that reduced the claimed invention to practice. And the testimony that he provides about conception, extensive testimony about conception, including transmission in his Rule 131 and supplemental declaration as well, and reduction of practice explains how each of the claims were met, both at the conception stage and the reduction of practice stage. And the evidence that he provided is sufficient under the perfect surgical standard to support a finding that he was reasonably diligent. And the way the board applied that legal standard, reasonable diligence here, was incorrect. And it needs to be remanded to the board for determination the first instance of whether it was a—whether the reasonable diligence standard was met or not. With respect to the transition claims, Davenport, in addition to her specification, attaches source code to the back of her patent that explains exactly how she created these transitions that she's talking about in the specification and all the segments. Our expert, Dr. Loy, examined that source code. It confirmed that all of the segments that she has produced in the source code disclosed in the patent require one segment at a time to play. They don't have any overlapping segments playing at the same time as required by the transition claims that issue in Mr. Baer's patent. Their expert described the transition claims in terms of 1999's timeframe. But at the time that Davenport created her transitions, she testified, and there's no evidence to suggest otherwise, that it was not possible to create the type of overlapping transitions that Mr. Baer invented at a later time in 1999. And there's no other reference cited that would support an obvious determination in conjunction with Davenport in that regard. And finally, the Q container claims, we did cite the—I'm sorry, we did cite that the report was an error in relying on Sposato. Sposato itself is not prior art for the reasons we first stated, and so we think that all that should go back to the board to determine in the first instance. The board's construction remains incorrect, legally incorrect, because it was too broad. In addition to the figure that describes the Q container, there is a figure that shows a Q appearing in an entire screen, figure 4A. And if the Q container could encompass that entire screen, was broad enough to reach the board's construction, then the specification would refer to that as a Q container as well, but it doesn't do so. And that's further support in the specification for the type of construction that we are urging and suggests that the—indicates that the board's construction itself is too broad and unreasonable. Thank you. Thank you, Mr. Christian. We will take the case under review.